**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ZAITA,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>JUNIPER NETWORKS, INC., RAMI RAHIM, ANNE DELSANTO, KEVIN DENUCCIO, JIM DOLCE, STEVE FERNANDEZ, CHRISTINE GORJANC, JANET HAUGEN, SCOTT KRIENS, RAHUL MERCHANT, and WILLIAM STENSRUD,<br><br>　　　　　　　Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, John Zaita ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. Plaintiff brings this stockholder action against Juniper Networks, Inc. ("Juniper" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual

1  Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Hewlett Packard Enterprise Company ("Parent"), through merger vehicle Jasmine Acquisition Sub, Inc. ("Merger Sub," together with Parent, "HPE") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a January 10, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, each share of common stock, of the Company ("Company Common Stock") outstanding immediately prior to the effective time of the Merger (the "Effective Time") will, at the Effective Time, automatically be converted into the right to receive $40.00 in cash, without interest and subject to applicable withholding taxes (the "Merger Consideration"). The aggregate equity value of the Company Common Stock acquired by Parent will be approximately $14 billion.

3. Thereafter, on February 7, 2024, the Company filed a Preliminary Proxy Statement (the "Proxy Statement") on Form PREM14A with the SEC in support of the Proposed Transaction.

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: (a) Company insiders own large illiquid blocks of Company stock which will be converted into merger consideration; (b) Company insiders own company options, restricted stock units, and other equity awards, all of which are subject to accelerated vesting and conversion into merger consideration; and (c) certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5. The Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the

1  Proposed Transaction and is thus in violation of the Exchange Act. As detailed below, the Proxy
2  Statement omits and/or misrepresents material information concerning, among other things: (a)
3  the sales process and in particular certain conflicts of interest for management, including the
4  employment agreement entered into between HPE and Defendant Rahim; (b) the financial
5  projections for Juniper, provided by Juniper management to the Company Board and the
6  Company's financial advisor Goldman Sachs & Co. LLC ("Goldman Sachs") and (c) the data and
7  inputs underlying the financial valuation analyses, if any, that purport to support the fairness
8  opinion created by Goldman Sachs, if any, and provide to the Company.

9  6.  Absent judicial intervention, the Proposed Transaction will be consummated,
10 resulting in irreparable injury to Plaintiff.

**PARTIES**

12 7.  Plaintiff is a citizen of New Jersey, and at all times relevant hereto, has been a
13 Juniper stockholder.

14 8.  Defendant Juniper designs, develops, and sells network products and services
15 worldwide. The Company is incorporated in Delaware and has its principal place of business at
16 1133 Innovation Way, Sunnyvale, CA, 94089. Shares of Juniper common stock are traded on the
17 New York Stock Exchange ("NYSE") under the symbol "JNPR."

18 9.  Defendant Rami Rahim ("Rahim") has been a director of the Company at all
19 relevant times. Defendant Rahim also serves as the Company's Chief Executive Officer ("CEO").

20 10. Defendant Anne DelSanto ("DelSanto") has been a director of the Company at
21 all relevant times.

22 11. Defendant Kevin DeNuccio ("DeNuccio") has been a director of the Company
23 at all relevant times.

24 12. Defendant Jim Dolce ("Dolce") has been a director of the Company at all relevant
25 times.

26 13. Defendant Steve Fernandez ("Fernandez") has been a director of the Company
27 at all relevant times.

28

14. Defendant Christine Gorjanc ("Gorjanc") has been a director of the Company at all relevant times.

15. Defendant Janet Haugen ("Haugen") has been a director of the Company at all relevant times.

16. Defendant Scott Kriens ("Kriens") has been the Chairman of the Company Board at all relevant times.

17. Defendant Rahul Merchant ("Merchant") has been a director of the Company at all relevant times.

18. Defendant William Stensrud ("Stensrud") has been a director of the Company at all relevant times.

19. Defendants identified in ¶¶ 9 - 18 are collectively referred to as the "Individual Defendants."

20. Non-Party Parent HPE offers general purpose servers for multi-workload computing and workload-optimized servers; HPE ProLiant rack and tower servers; HPE Synergy; HPE Alletra, HPE GreenLake, Zerto, HPE InfoSight, and HPE CloudPhysics storage products; HPE Cray EX, HPE Cray XD, and converged edge systems; and HPE Superdome Flex, HPE Nonstop, and HPE Integrity products.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

22. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as

to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

## **SUBSTANTIVE ALLEGATIONS**

*Company Background*

24. Juniper designs, develops, and sells network products and services worldwide. The company offers routing products, such as ACX series universal access routers to deploy high-bandwidth services; MX series Ethernet routers that function as a universal edge platform; PTX series packet transport routers; wide-area network SDN controllers; and session smart routers.

25. In a press release on October 26, 2023, for the Third Quarter 2023 Financial Results, the Company highlighted its performance results and financial success. For example, the Company reported Non-GAAP operating margin was 17.5%, an increase from 17.2% in the third quarter of 2022, and an increase from 16.9% in the second quarter of 2023; and Non-GAAP net income was $193.9 million, an increase of 2% year-over-year, and an increase of 3% sequentially.

26. Speaking on the results, Defendant CEO Rahim stated, "We delivered better than expected Q3 results due to another record quarter in our enterprise business, which represented more than 50% of total company revenue for the first time in the company's history."

27. Defendant CEO Rahim continued, noting the Company's likelihood for future success: "While we are continuing to experience headwinds from our cloud and service provider customers, many of which are still digesting prior purchases, our enterprise momentum remains strong and provides confidence in our future growth prospects."

28. The financial results are not an anomaly, but rather, are indicative of a trend of continued success by Juniper. Based upon these positive results and outlook, the Company is likely to have future success.

29. Despite this upward trajectory, the Individual Defendants have caused Juniper to enter into the Proposed Transaction without providing requisite information to Juniper stockholders such as Plaintiff.

*The Flawed Sales Process*

30. As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

31. Moreover, the Proxy Statement fails to adequately disclose why the Company didn't insist on a Go-Shop period given the fact that the Company failed to conduct a meaningful market check.

32. Moreover, the Proxy Statement fails to adequately disclose the nature of the confidentiality agreement entered into between the Company and HPE, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

33. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

34. On January 9, 2024, Juniper and HPE issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> **HOUSTON, Texas and SUNNYVALE, California – January 9, 2024 –** Hewlett Packard Enterprise (NYSE: HPE) and Juniper Networks, Inc. (NYSE: JNPR), a leader in AI-native networks, today announced that the companies have entered a definitive agreement under which HPE will acquire Juniper in an all-cash transaction for $40.00 per share, representing an equity value of approximately $14 billion.
>
> The combination of HPE and Juniper advances HPE's portfolio mix shift toward higher-growth solutions and strengthens its high-margin networking business, accelerating HPE's sustainable profitable growth strategy. The transaction is expected to be accretive to non-GAAP EPS and free cash flow in the first year post close.

The acquisition is expected to double HPE's networking business, creating a new networking leader with a comprehensive portfolio that presents customers and partners with a compelling new choice to drive business value. The explosion of AI and hybrid cloud-driven business is accelerating demand for secure, unified technology solutions that connect, protect, and analyze companies' data from edge to cloud. These trends, and AI specifically, will continue to be the most disruptive workloads for companies, and HPE has been aligning its portfolio to capitalize on these substantial IT trends with networking as a critical connective component.

Combining HPE and Juniper's complementary portfolios supercharges HPE's edge-to-cloud strategy with an ability to lead in an AI-native environment based on a foundational cloud-native architecture. Together, HPE and Juniper will provide customers of all sizes with a complete, secure portfolio that enables the networking architecture necessary to manage and simplify their expanding and increasingly complex connectivity needs. Leveraging industry-leading AI, the combined company is expected to create better user and operator experiences, benefitting customers' high-performance networks and cloud data centers.

Through its suite of cloud-delivered networking solutions, software, and services including the Mist AI and Cloud platform, Juniper helps organizations securely and efficiently access the mission-critical cloud infrastructure that serves as the foundation of digital and AI strategies. The combination with HPE Aruba Networking and purposely designed HPE AI interconnect fabric will bring together enterprise reach, and cloud-native and AI-native management and control, to create a premier industry player that will accelerate innovation to deliver further modernized networking optimized for hybrid cloud and AI.

Upon completion of the transaction, Juniper CEO Rami Rahim will lead the combined HPE networking business, reporting to HPE President and CEO Antonio Neri.

"HPE's acquisition of Juniper represents an important inflection point in the industry and will change the dynamics in the networking market and provide customers and partners with a new alternative that meets their toughest demands," said Neri. "This transaction will strengthen HPE's position at the nexus of accelerating macro-AI trends, expand our total addressable market, and drive further innovation for customers as we help bridge the AI-native and cloud-native worlds, while also generating significant value for shareholders. I am excited to welcome Juniper's talented employees to our team as we bring together two companies with complementary portfolios and proven track records of driving innovation within the industry."

"Our multi-year focus on innovative secure AI-native solutions has driven Juniper Networks' outstanding performance," said Rami Rahim, CEO of Juniper Networks. "We have successfully delivered exceptional user experiences and simplified operations, and by joining HPE, I believe we can accelerate the next phase of our

journey. In addition, this combination maximizes value for our shareholders through a meaningful all-cash premium. We look forward to working with the talented HPE team to drive innovation for enterprise, service provider and cloud customers across all domains, including campus, branch, data center and the wide area network."

**Compelling Strategic Benefits**

- **Compelling pro forma financial profile.** In addition to the expected non-GAAP accretion, the combined company is expected to have attractive top- and bottom-line growth opportunities immediately and in the long term.

- **Positions HPE for long-term growth for shareholders and greater investment capacity.** With Juniper, HPE's portfolio will be weighted toward higher-growth, higher-margin businesses with large free cash flow potential, positioning HPE to enhance shareholder return and enabling additional investments in high-growth areas, such as AI and cloud. On a pro forma basis, the new networking segment will increase from approximately 18% of total HPE revenue as of fiscal year 2023 to approximately 31% and contribute more than 56%[1,] of HPE's total operating income.

- **Complementary capabilities to deliver next-generation AI-native networking and enable new digital experiences through secure, intelligent connectivity.** Networking will become the new core business and architecture foundation for HPE's Hybrid Cloud and AI solutions delivered through our HPE GreenLake hybrid cloud platform. The combined company will offer secure, end-to-end AI-native solutions that are built on the foundation of cloud, high performance, and experience-first, and will also have the ability to collect, analyze, and act on aggregated telemetry across a broader installed base. This will drive even better end-user experiences and streamlined network operations for our customers.

- **Accelerates HPE's strategic evolution and expands total addressable market.** The acquisition increases the scope of HPE's networking business and will create meaningful opportunities to provide even more comprehensive solutions to Juniper's installed base of enterprise customers, communication service providers and tier-one cloud customers, as well as launches HPE into adjacent large segments, including data center networking, firewalls, and routers. It also grows Juniper's footprint in data centers and cloud providers.

**Transaction Details and Approvals**

Under the terms of the agreement, which has been unanimously approved by the Boards of Directors of HPE and Juniper, Juniper shareholders will receive $40.00 per share in cash upon the completion of the transaction. The purchase price represents a premium of approximately 32% to the unaffected closing price of

Juniper's common stock on January 8, 2024, the last full trading day prior to media reports regarding a possible transaction.

The transaction is expected to be funded based on financing commitments for $14 billion in term loans. Such financing will ultimately be replaced, in part, with a combination of new debt, mandatory convertible preferred securities, and cash on the balance sheet. The transaction is currently expected to close in late calendar year 2024 or early calendar year 2025, subject to receipt of regulatory approvals, approval of the transaction by Juniper shareholders, and satisfaction of other customary closing conditions.

The combination is expected to achieve operating efficiencies and run-rate annual cost synergies of $450 million within 36 months post close. Strong growth in free cash flow, along with maintenance of capital allocation policies, are expected to provide sufficient room to reduce leverage to approximately 2x in two years post close. Following the completion of the transaction, HPE will continue its innovation and go-to-market investments in its networking business, one of its growth engines.

*Potential Conflicts of Interest*

35. The breakdown of the benefits of the deal indicates that Juniper insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Juniper.

36. Company insiders currently own large, illiquid portions of Company stock all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percent Owned(1) |
|---|---|---|
| **Directors and Executive Officers** | | |
| Anne DelSanto | 25,643 | * |
| Kevin DeNuccio | 21,368 | * |
| James Dolce | 24,313 | * |
| Steven Fernandez | 7,107 | * |
| Christine Gorjanc | 36,443 | * |
| Janet Haugen | 36,443 | * |
| Christopher Kaddaras(6)** | 74,671 | * |
| Scott Kriens(7) | 2,262,820 | * |

| Name | Number | Percent |
|---|---|---|
| Manoj Leelanivas(8)** | 300,504 | * |
| Rahul Merchant(9) | 73,813 | * |
| Kenneth Miller(10)** | 326,698 | * |
| Robert Mobassaly(11)** | 52,617 | * |
| Rami Rahim(12)** | 1,214,009 | * |
| William Stensrud(13) | 109,837 | * |
| All executive officers and directors as a group (15 persons)(14) | 4,608,467 | 1.42% |

37. Additionally, Company insiders currently own large amounts of company options, restricted stock units, and other equity awards, granting them rewards not shared amongst Plaintiff and other public stockholders of the Company.

| Name | Company Option Awards Number (#) | Company Option Awards Value ($) | Company RSU Awards Number (#) | Company RSU Awards Value ($) | Parent Retention RSU Award Number (#) | Parent Retention RSU Award Value ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Rami Rahim | 181,644 | 1,031,738 | 876,928 | 35,077,100 | 194,679 | 3,000,000 | 39,108,838 |
| Manoj Leelanivas | — | — | 324,643 | 12,985,720 | — | — | 12,985,720 |
| Robert Mobassaly | — | — | 137,517 | 5,500,680 | — | — | 5,500,680 |
| Kenneth B. Miller | — | — | 277,011 | 11,080,440 | — | — | 11,080,440 |
| Christopher Kaddaras | — | — | 258,400 | 10,336,000 | — | — | 10,336,000 |

38. Moreover, certain employment agreements with certain Juniper executives entitle such executives to severance packages, should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Name | Cash ($) (1) | Equity ($) (2) | Perquisites/Benefits ($) (3) | Total ($) (4) |
|---|---|---|---|---|
| Rami Rahim | 14,500,000 | 39,108,838 | 40,410 | 53,649,248 |
| Manoj Leelanivas | 1,950,000 | 12,985,720 | 40,410 | 14,976,130 |
| Robert Mobassaly | 1,440,000 | 5,500,680 | 40,410 | 6,981,090 |
| Kenneth B. Miller | 1,950,000 | 11,080,440 | 40,410 | 13,070,850 |
| Christopher Kaddaras | 1,905,000 | 10,336,000 | 28,664 | 12,269,664 |

| Name | Base Salary Severance ($) | Annual Target Bonus Severance ($) | Retention Cash Award ($) | Total ($) |
|---|---|---|---|---|
| Rami Rahim | 2,000,000 | 3,500,000 | 9,000,000 | 14,500,000 |
| Manoj Leelanivas | 975,000 | 975,000 | — | 1,950,000 |
| Robert Mobassaly | 720,000 | 720,000 | — | 1,440,000 |

| | | | | |
|---|---|---|---|---|
| Kenneth B. Miller | 975,000 | 975,000 | — | 1,950,000 |
| Christopher Kaddaras | 952,500 | 952,500 | — | 1,905,000 |

39. The Proxy Statement fails to adequately disclose communications regarding post-transaction employment. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

40. Thus, while the Proposed Transaction is not in the best interests of Juniper, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

*The Materially Misleading and/or Incomplete Proxy Statement*

41. The Juniper Board caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

42. The Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy Statement fails to disclose:

    a. Why the Company didn't insist on a Go-Shop period given the fact that the Company failed to conduct a meaningful market check; and

    b. The nature of the confidentiality agreement entered into between the Company and HPE, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained

therein, including, all specific conditions, if any, under which such provisions would fall away.

*Omissions and/or Material Misrepresentations Concerning Juniper Financial Projections*

43. The Proxy Statement fails to provide material information concerning financial projections for Juniper provided by Juniper management to Goldman Sachs and relied upon by Goldman Sachs in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

44. Notably, the Proxy Statement reveals that as part of its analyses, Goldman Sachs reviewed: "The Management Projections (as defined in the section of this proxy statement captioned "*The Merger-Management Projections*")."

45. The Proxy Statement should have, but fails to provide, certain information in the projections that Juniper management provided to Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

46. With regards to the *Management Projections*, the Proxy Statement fails to disclose:
   a. The specific inputs, metrics, and assumptions used to determine Total Revenues, EBITDA, Non-GAAP Operating Income, Unlevered Free Cash Flow and Unlevered Free Cash Flow less Stock Based Compensation.

47. The Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

48. This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

49. Without accurate projection data presented in the Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Goldman Sachs's financial analyses, or make an informed decision whether to vote his shares in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Goldman Sachs*

50. In the Proxy Statement, Goldman Sachs describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

51. With respect to the *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

   a. The specific inputs, metrics, and assumptions used to determine the discount rates of 7.75% to 9.75% utilized;
   b. The weighted average cost of capital for the Company utilized;
   c. The specific inputs, metrics, and assumptions used to determine the perpetuity growth rates range of 1.00% to 2.00% utilized;
   d. The number of fully diluted outstanding shares of Juniper utilized.

52. With respect to the *Illustrative Present Value of Future Share Price Analysis*, the Proxy Statement fails to disclose:

   a. The specific inputs, metrics, and assumptions used to determine the illustrative NTM P/E multiples range of 12.0x to 15.0x utilized;
   b. The specific inputs, metrics, and assumptions used to determine the discount rate of 9.0% utilized; and
   c. The specific inputs used in application of the Capital Asset Pricing Model.

53. With respect to the *Selected Transactions Analysis*, the Proxy Statement fails to disclose:

    a. The specific date on which each transaction closed;

    b. The aggregate value of each selected precedent transaction;

    c. The specific inputs, metrics, and assumptions used to determine the applied EV/NTM EBITDA multiples range of 9.0x to 12.0x;

    d. Juniper's net debt as of September 30, 2023, utilized; and

    e. The number of fully diluted shares of Juniper utilized.

54. With respect to the *Premia Paid Analysis*, the Proxy Statement fails to disclose:

    a. The specific transactions analyzed;

    b. The specific acquisition price per share for the transactions analyzed; and

    c. The specific inputs, metrics, and assumptions used to determine the reference range of illustrative premiums of 20% to 50% applied to the undisturbed closing price per share of Juniper Common Stock of $30.22 as of January 8, 2024.

55. With respect to the *Selected Public Companies Analysis*, the Proxy Statement fails to disclose:

    a. The inputs, metrics, and assumptions used to determine the Enterprise Value for each of the selected companies;

    b. The specific inputs, metrics, and assumptions used to determine the Service Provider Selected Companies' NTM P/E multiples range of 9.2x to 15.6x utilized;

    c. The specific inputs, metrics, and assumptions used to determine the Enterprise Selected Companies' NTM P/E multiples range of 9.0x to 33.7x utilized;

    d. The specific inputs, metrics, and assumptions used to determine the Juniper "Street" NTM P/E multiple of 12.9x utilized; and

    e. The specific inputs, metrics, and assumptions used to determine the Juniper "Management Projections" NTM P/E multiple of 12.9x utilized.

56. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

57. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Juniper stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

58. Plaintiff repeats all previous allegations as if set forth in full herein.

59. Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

60. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

61. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

62. The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

63. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

64. The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

65. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

## Violations of Section 20(a) of the Exchange Act

## (Against all Individual Defendants)

66. Plaintiff repeats all previous allegations as if set forth in full herein.

67. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

68. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

69. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Juniper's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

70. The Individual Defendants acted as controlling persons of Juniper within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Juniper to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Juniper and all of its employees. As alleged above, Juniper is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: February 21, 2024

**BRODSKY SMITH**

By: *Evan J. Smith*
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*